# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

JOHOINE WHITE, Individually

     Plaintiff.                                Case No.:

v.                                       Hon. Judge Hala Y. Jarbou

CITY OF BENTON HARBOR;
COUNTY OF BERRIEN;
OFFICER STEVE BOBO, Individually
and in his official capacity; OFFICER
DAVID WILSON, Individually
and in his official capacity; OFFICER
ROBERT SHEPHARD, Individually
and in his official capacity; JENNIFER
FIELDS, Individually and in her official
Capacity; Unknown, and any yet be
discovered parties.

     Defendants.

---

John R. Beason III, Esq.
The J.R. Beason Firm PLLC.
Attorney for the Plaintiffs
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com

(1)

## **PLAINTIFF'S FIRST AMENDED COMPLAINT AND REQUEST FOR DAMAGES**

Plaintiff, Johoine White, comes now, through counsel, and brings this action for violations of the Fourth and Fourteenth Amendments via an unreasonable seizure and the excessive force used to effect it. Defendants the City of Benton Harbor, Officers Steve Bobo, David Wilson, Robert Shephard, an Unknown officer, and Attorney Jennifer Fields in their individual and official capacities, acted pursuant to the County Defendant's customs of conspiracy, equal protection, and due process clause violations when they seized the Plaintiffs without probable cause, indifferently used unneeded excessive force, and falsified police incident report records to excuse and cover-up the unconstitutional, violent seizure.  The Plaintiffs allege as follows:

(2)

## **INTRODUCTION**

This is a Civil Action asserting claims under the Federal Constitution, the Civil Rights Act of 1964, and substantiating violations of U.S. Const. amend. IV, U.S. Const. Amend. VI, U.S. Const. amend. XIV,  42 U.S.C. § 2000d, 42 U.S.C. § 2000a, 42 U.S.C. § 12132, 42 U.S.C. § 12202, 42 U.S.C. §1981(c), 42 U.S.C. §

1985, 42 U.S.C. § 1986, 42 U.S.C. §1983, 29 U.S.C. § 794, Mich. Comp. Laws § 780.318.

(3)

## JURISDICTION AND VENUE

This court has jurisdiction over all causes of action set forth in this complaint pursuant to 28 U.S.C § 139, as the plaintiffs and the Defendants reside in the County of Berrien, in the State of Michigan.  The occurrence of the significant and relevant incidents giving rise to this complaint took place in Benton Harbor, MI, County of Berrien, within the jurisdiction of this Court.

(4)

## THE PARTIES

Plaintiff is citizen of the State of Michigan and resides in the City of Benton Harbor in the County of Berrien.

(5)

Defendants, City of Benton Harbor, County of Berrien, Officers Steve Bobo, David Wilson, Robert Shephard, and Attorney Jennifer Fields are citizens of the State of Michigan with the competency and capacity to sue and be sued.  At the time of the

alleged unconstitutional conduct, the Defendants were employees and or residents in Benton Harbor, MI, and or (Berrien County) and currently retains domicile and residences within the District of Western Michigan.  The Defendant City of Benton Harbor, through its "Public Safety" department, is a municipal corporation entity operating within the County of Berrien in the Western District of the State of Michigan.

(6)

## FACTS GIVING RISE TO PLAINTIFF'S COMPLAINT

In 1999, Johoine White suffered a workplace injury that left him disabled, and he continued to suffer chronic pain when he had a violent and injurious encounter with Benton Harbor Public Safety police officers that extremely worsened his condition.  After the initial work injury left him disabled, Mr. White has endured problems with mobility and chronic pain.  Prior to his encounter with Benton Harbor Public Safety officers, the Plaintiff regularly used multiple limb and back braces just to ride public transportation to and from local stores.  I was managing my pain and disability symptoms by attempting to walk and get out of the house when I encountered Benton Harbor Police Officers who subjected me to excessive force, severely worsening my condition.

(7)

On November 12th, 2021, during the day, Mr. White was walking on Pavone Ave. in Benton Harbor, MI.  As part of his medical routine for managing his disabilities, the Plaintiff left his home at 597 Pavone Ave. intending to get some fresh air and exercise.  Mr. White did not make it far down Pavone before he felt winded and laid down to take a rest.  The Plaintiff often enjoys gazing at the sun and does so for relaxation purposes.  After doing so, he got up and continued walking towards Britain Avenue, when he saw Officer Shepherd with his taser pointed at him.  Prior to approaching Mr. White with his taser drawn, Officer Shephard nor any other officer had made contact or a request of the Plaintiff.  Having no reason to draw arms on him, Officer Shephard's unsubstantiated and unwarranted actions of drawing his taser without speaking angered and befuddled the Plaintiff, so he responded sarcastically by asking Defendant if he wanted to perform fallacio on him.  Officer Shephard shook his head no and presumably called for backup.

(8)

The Plaintiff showed Officer Shephard his utility knife while he was standing on Britain Ave and the Plaintiff was on Pavone Ave., a significant distance away from each other.  Plaintiff asserts that if his body camera was on, it would have recorded

the initial contact.  Officer Wilson arrived on the scene after Officer Shephard drew

his taser on the Plaintiff before speaking with him.  Officer Wilson missed the

initial exchange between the Plaintiff and Officer Shepherd, but parked on Pavone

Ave. between the Plaintiff and his home. With Officer Shephard on Britain and

Officer Wilson now cutting off his route home, the Plaintiff felt surrounded and

entrapped by the officers.  Due to his chronic pain, lack of mobility, and having a

taser pointed at him without cause, the Plaintiff became more agitated as the police

officers continued to harass him.  Without stating why, the Officers repeated that

they wanted to speak with him, but voiced no presumed crime or illegal activity

that they were interested in. Officer Wilson eventually lied on the stand about

being the first officer on the scene to support and go along with the prosecution's

narrative.   Because Officer Wilson arrived second and was parked in between Mr.

White and his home, the Plaintiff continued to walk towards Britain Ave and

Officer Shephard.

(9)

Due to his chronic pain, lack of mobility, and having a taser pointed at him without

cause, Mr. White became more agitated as the police officers continued to ask to

speak with him.  While closing in on him, the Officers stated that they wanted to

speak with the Plaintiff, but would not state why; they did not voice any crime they

believed he committed nor did they allude to any suspicion that they had of him.  If the Defendants had some genuine interest in speaking with the Plaintiff, they would have made contact without weapons drawn.  To look up and see a police officer pointing a taser at you before saying a word was frightening and extremely offensive.

(10)

As the Plaintiff continued to walk towards Britain Avenue, he noticed multiple police officers had arrived in the area and were focused on him.  At that point, the Plaintiff asserts that he just wanted to be left alone.  As the officers continued to follow him with a taser and shotgun drawn, he asked Officer Bobo why they were following him.  No one stated that he was detained, arrested, or a suspect of any kind of wrong doing, just that they "wanted" to talk to him.  Officer Bobo did not answer the Plaintiffs question.  The Plaintiff began walking back towards his home and reports that just as he began to cross Britain street back towards his house on Pavone Ave. is when Officer Wilson made verbal contact with him for the first time, stating: "Hey, what's going on today man?" the Plaintiff responded, "Too much everyday" irritated by the series of events, the unwarranted police attention, and his struggle to get back home.  Officer Sheppard, a Caucasian, spoke again and

asked to speak with the Plaintiff, again failing to explain why he had interest in doing so.  Mr. White quickly informed him that he did not want to talk with him.

(11)

Mr. White, admittedly, acted outside of his character and continued speaking disrespectfully to the officers as they continued to follow him and force contact. Because he was recently attacked by his neighbors and failed to get a resolution from police, the Plaintiff was on edge and easily irritable the day the police singled him out.  Mr. White maintains that he did not make any threats, but he did say "F*** you" to the officers and sarcastically asked them if they wanted to perform fallacio on him (S*** my d***) in an attempt to return some of the disrespect that he felt he was shown.  The Officers were pursuing him, with a taser and shotgun drawn, but refrained from offering an explanation, other than wanting to speak about some unknown subject.  The Plaintiff wrongfully had officers pointing a shotgun and taser pointed at him for no reason.  Understandably, Mr. White attests that he was overwhelmed, felt picked on, mistreated, and randomly bullied by his local Public Safety Officers for no reason.  Mr. White maintains that being disrespectful is far outside of his character and not at all how he normally behaves. The Defendants stated that they believed Mr. White was mentally disabled, but acted to escalate the encounter into a physical violence and not to diffuse the

situation by explaining what they wanted to speak about, how it related to the Plaintiff, and why it was pertinent for them to do so.

(12)

Prior to being singled out and harassed by BHDPS, Mr. White had endured harassment from neighbors.  Mr. White alleges that his neighbor paid a youth in the community to shoot him with a paintball gun in response to a verbal dispute they had.  Because of the verbal dispute and ensuing assault, Mr. White began carrying a box-cutter knife on him for personal protection when he left his home.  Mr. White maintains that he did not do anything wrong by possessing, announcing, and showing officers that he was in possession of the small knife.  Between his disability and random ill treatment, like being shot with a paintball while minding his business on his property, the Plaintiff became overwhelmed and acted out of his character in frustration and defense of dignity and rights.  Nevertheless, the Plaintiff maintains that he did so in reaction to the Defendant's provocative instigation of pulling a taser on him without cause.  Before the Defendants drew weapons on Mr. White and forced him into an interaction with them, he did not commit a crime or present a danger to the officers or citizens.  Despite having done nothing wrong to attract police attention, Mr. White contends that he found himself behind the cocked barrel of a shotgun because he refused to talk with police

officers, all after only intending to get some fresh air and exercise; it was clear to him that day was not a normal day, and if it was his day to die, at that point, he asserts that he just wanted it to get done and over with.

(13)

Mr. White, overwhelmed by frustration, told the officer who was pointing a gun at him to either shoot or stop following him.  In a transcript from a portion of the encounter, Officers are recorded stating several times that Mr. White is "Slow" and has "Problems", alluding to their knowledge of his fragile mental state and disabilities.  The Defendant used their knowledge of the Plaintiffs disabilities to antagonize him.  The Plaintiff never presented a threat or the impression that a crime was afoot prior to weapons being drawn on him and followed.  The Plaintiff asserts that the entire incident occurred and culminated because he was simply walking and existing while disabled and Black, when he refused an unsubstantiated Police interaction. Mr. White maintains that ordeal seemed like a surreal nightmare.

(14)

In his initial encounter with officer Shephard, the Plaintiff informed him, and later other officers, that he had a small utility knife in his coat pocket for personal

protection.  While clearly stating that he did not want to talk to them,  the Plaintiff answered the questions they asked while expressing his discontent, frustration, and anger with having to do so without a valid reason being proffered to him.  At all times while interacting with the Defendants, the Plaintiff maintained that he did not want to engage any further with them.  As they began to approach Mr. White and moving in his direction,  he began to fear that his good-faith disclosure of the knife would be used as an excuse to hurt him, so he attempted to throw it.  Officer Wilson though, directed the Plaintiff not to reach for anything and shot his taser at him.  Because the Plaintiff was wearing a heavy winter coat, the taser did not connect and Mr. White used the knife to cut the taser cord from his coat.  The Defendants, seeing that he was not affected by the taser and that he used the knife to cut the cord meant to tase him, they huddled momentarily, put down the shotgun, turned off body cameras, and rushed towards him.  It was at that point that the Plaintiff disregarded Officer Wilson's earlier directive, and threw his knife so that the Defendants could not accuse him of attempting to use it on them.  The Plaintiff asserts that he only used the knife to disconnect the taser cord because he did not want to injure himself by removing the live wire with my bare hands.  At no point did Mr. White intend to, or try to injure the officers, or use his knife to protect himself from their unsubstantiated assault and battery.  The Plaintiff asserts

that as the unknown officer, who had just put down his shotgun, approached him, he could see the deranged and psychotic look in his eyes.  Mr. White asserts that the unnamed Defendant was high off some sort of drugs and should have been drug-tested that day.  The Plaintiff maintains that none of the officers said anything or gave me any directions other than drop his knife, before they rushed him and tackled him to the ground, causing his head to bang against the concrete.  The box-cutter utility knife that he had for personal protection was not drawn when Officers initially pulled their weapons before speaking to him, and they were only aware of the knife's existence because Mr. White informed them about it willingly. When Mr. White first saw Officer Shephard, he had his taser drawn and pointed at him.  At no point prior to or after Officer Shephard drew his taser, did the Plaintiff make any aggressive gestures towards any officers or other citizens, nor did he make any statements of intentions to do so.  The Defendants, after asking to talk with the Plaintiff and being denied, had no reason or right to continue to draw and point weapons at Mr. White, nor did they ever have cause to treat him as a threat, suspect, or criminal.

(15)

Mr. White reports being scared for his life as the deranged looking unknown

officer and his cohorts turned off their body camera footage and rushed towards him.     After tackling the Plaintiff on the concrete and causing his head and shoulders to smash against the ground, the officers laid on top of him while simultaneously demanding that he roll over.    After laying on him, the Officers violently flipped him over and pulled his arms straight up without bending his elbows.    The slam on his injured back and torn rotator cuffs exacerbated his pre-existing conditions.    The Plaintiff rode to the hospital in an ambulance and informed officers and EMS medics that his rotator cuffs were previously torn and endured chronic pain conditions.

(16)

While present in the Berrien County Jail, the Plaintiff was denied medical attention and his prescribed meds.   A Berrien County jail employee administered Mr. White the wrong dosage of his meds and told him to either take them, and find out the medical consequences, or not and suffer without his meds.   Mr. White's requests for medical attention were regularly ignored over the one hundred days or so that I spent in the Berrien County Jail.   The Plaintiff was not given any accommodations for his disabilities and suffered more injuries as a consequence.   Mr. White was ordered by jail staff to carry his own tote, which he was unable to do because of his disability and injuries.    Instead, he dragged the tote and mattress as best as he

could, but could not get inside of the elevator fast enough, and the guard let the elevator close on his shoulder, further aggravating and intensifying his pain and injuries. The jail staff denied the Plaintiff basic accommodations for his disabilities and refused to show him rudimentary human decency.  The same injured shoulder was pinched between two elevator doors.  Again, as he was forced to move out the elevator to his cell, the Plaintiff did not receive any medical attention for his new injury, or any assistance in transporting materials after sustaining the injury and was left to suffer in his cell.

(17)

Despite his innocence, the Plaintiff faced several serious criminal charges born from the unwarranted police attack he suffered.  Mr. White pleaded not guilty to all of the charges that were levied against him and resisted pressure to accept a plea bargain to crimes he did not commit.  The Plaintiff asserts that in preparing his defense, and at his trial, his public defender Jennifer Fields sabotaged his defense and collaborated with the prosecution.  Mr. White maintains that Jennifer Fields intentionally refused to utilize exculpatory video evidence showing that he did not initiate the interaction and the events did not play out as the prosecution and police officers portrayed before the jury.  He further asserts that despite him clearly informing her of inconsistencies and lies in the prosecution's story, she ignored him

and asked the testifying Officers leading questions that corroborated their story and covered up his assertions.    Mr. White maintains that the Berrien County Prosecutors asserted that Officer Wilson, not the taser-pointing Officer Shepherd, was the first officer to make contact with him, and only presented short portions of Officer Wilson's body camera footage to the jury. The BHPS Officers further testified that Mr. White saw them riding pass and made several gun gestures towards them as they rode by.   Mr. White attests that this narrative was false and that he did not notice any officer until he saw one with a taser pointed at him. From the beginning of the Plaintiff's and Jennifer Field's client attorney relationship, the Plaintiff asserted to his attorney and maintained that it was officer Sheppard who was the first officer to make contact with him, and that the narrative that would come before the jury should begin with the body camera footage of Officer Shephard, which would show that he did not instigate the interaction nor resist a valid arrest.  Of the four officers on the scene, only a short portion of one officer's body camera video was used by Jennifer Fields.  Prior to the trial, Jennifer Fields showed Mr. White body camera footage from the unknown, shotgun wielding plainclothes officer, which recorded when he threw the knife and why. The unused video also showed the undercover officer flipping the boxcutter in his hand over and over like he won a prize, as if the mere presence of the boxcutter

would excuse their behavior.  Despite this, and Mr. White's clear and direct request, Jennifer Fields did not use that video in the trial and refused to put forth Mr. White's version of events.  Mr. White asserts that prior to the trial beginning, he told the judge and all parties that he was not comfortable with the proceedings. Mr. White maintains that Jennifer Fields was in possession of several body camera videos, but refused to use the other three officers' footage, and then further asked the officers corroborating, leading questions at trial as overt acts in collaboration with the prosecution. While being in possession of videos that show the Plaintiff threw the knife after cutting the taser cord, and just before Officers rushed him, the Public Defender asked the undercover officer at trial: "When you pulled the shotgun, that's when Mr. White disarmed?", to which he agreed.  Mr. White maintains that was not true and they both knew it.  Mr. White asserted to his attorney then, and still maintains that the knife was in his pocket and not visible when the taser and shotgun were initially drawn on him.  Mr. White maintains that his public defender Jennifer Fields assisted with detailing a false-factual narrative to the jury, denying him a genuine defense and directly contributing to his wrongful conviction.

(18)

Mr. White maintains that he only informed the officers that he had the knife after

they asked if he had any weapons on his person, which was after their weapons were already drawn.  The Plaintiff asserts that he only brought the knife out of his pocket after the Defendants attempted to tase him and only used it to cut the dangerous live cord stuck in his winter coat. Mr. White maintains that he threw the knife when they rushed towards him, not when the shotgun was drawn.  The Plaintiff asserts that Jennifer Fields was aware that he did not have his small box cutter drawn when the officers drew weapons on him and that he threw it in reaction to their impending assault.  Mr. White asserts that he knows that Jennifer Fields was aware of the actual series of events because they watched the officer's video footage together. The Plaintiff maintains that when Jennifer Fields asked the testifying officers leading questions that guided their answers to simply agreeing with her erroneous statements, she purposely elicited false testimony to sabotage his defense and hide the truth, which is that the officers initiated contact with weapons already drawn.  Mr. White asserts that before the Officers attempted to tase him, he had not drawn the knife, for his own safety and fear of actually being killed or injured by the officers and their weapons.  The Plaintiff asserts that he only took the box-cutter out to avoid being electrically shocked and threw it to avoid harming the officers or being accused of having any intentions to do so.  The Plaintiff asserts that the Berrien County Prosecutor's and Public Defender's offices

were aware of the above stated facts and in possession of exculpatory evidence proving his innocence, but collaborated together to present a false narrative to the jury and have him convicted.  Mr. White asserts that he did not receive a good-faith defense and that he wholeheartedly believes that his public defender collaborated with the Berrien County prosecutor's office against him.

(19)

The Plaintiff asserts that the officers who testified in his trial lied on the stand and were aware that he did not attempt to harm any officer nor resist a valid arrest.  Mr. White further asserts that both the prosecution and his public defender were aware that he did not draw his weapon prior to the attempted tasing, and that he did not disarm and throw his knife when the officer pulled his gun.  To the contrary, Mr. White asserts that he told the gun-wielding officer to shoot him or leave him alone. Mr. White asserts that had he drawn the knife, the officers would have shot him, so he did not reach for it until after they escalated the encounter by attempting to tase him.  Mr. White asserts that he only took the knife out for his own safety, to cut the taser cord, and not as a threat to the officers.  At no point did Mr. White pose a physical threat to the officers.  The plainclothes officer who pulled the shotgun on Mr. White, also picked the knife up after he threw it.  The Plaintiff asserts that the unknown, deranged looking officer seemed proud of himself, and joyfully flipped

the small knife in the air repeatedly in glee, as if he knew by simply recovering a knife, that he would attain it an automatic conviction and vindication of the violence they inflicted.  The Plaintiff wore three back-braces at his trial and endured extreme pain.  Mr. White asserts that he could not think or act fast enough to object on his own behalf to his defense attorney's tactics.  Nevertheless, when Judge Arthur Cotter asked Mr. White if he was comfortable with the proceedings, he responded that he was not comfortable with "any of it" because it had become clear to him that his public defender did not want to defend him.  The Plaintiff asserts that the Judge disregarded his answer to his question, did not ask any follow-up questions, and proceeded with the trial anyway.  The Plaintiff's public defender attorney Jennifer Fields, in disregard for his obvious disabilities, directed him to write down anything he wanted to communicate to her instead of speaking it out loud.  Mr. White asserts she gave this directive to keep him from objecting and voicing his discontent out loud and on the trial record.   Mr. White asserts that by the time he noticed that Jennifer Fields was feeding false information for the Defendants to agree to, he did not know what he needed to or if it was possible for him to stop the proceedings and retain proper counsel.  The Plaintiff asserts that he could not write to her and direct her stop nor could he afford a private defense attorney to take her place.  Mr. White felt betrayed, abandoned, and helpless.  He

maintains that the testifying officers could not look into his attorney's eyes as they agreed to her false statements.  Mr. White asserts that the testifying officers' body language and demeanor showed that he knew that he was wrong for what he was doing on the stand, after taking an oath to speak the truth.

(20)

The Plaintiff was ultimately convicted of six counts; three "assault with a deadly weapon" charges and three "police officer assault - resisting arrest" charges.  Those convictions sound like the Plaintiff is a dangerous and vicious felon, but was only sentenced to forty-nine days.  Due to his disability at the time of the incident, the Plaintiff did not have the capacity to resist a reasonable arrest or pose a threat to Police officers without a firearm.  The Plaintiff asserts that he was only guilty of speaking disrespectfully to police officers after being treated disrespectfully by them when they drew their weapons without cause and forced an unwanted interaction. Mr. White further asserts that he was punished with excessive force, false charges, jail time with real dangerous criminals, slanderous convictions on his record, and life long, irreparable injuries.  As a result of the Defendants attack, Mr. White still attends the pain clinic for therapy, treatments, and medications on a regular basis; He will likely have to do so for the rest of my life as a consequence of the slam on his back that caused my head to smash on the cement and shoulder

injury he suffered in the Berrien County Jail.

(21)

After his release, Mr. White made a formal complaint against the officers and followed up with the Director of Public Safety, but asserts that he never heard back from anyone and his grievance was ignored.  The Plaintiff maintains that what he suffered and continues to live through is terrifying, physically excruciating, and mentally tormenting.   Knowing how easily an innocent person can be targeted, charged, and abused has caused lasting trauma, as Mr. White is now scared to leave his home.  Furthermore, the trauma-induced lack of movement is deteriorating his health.  The immobility issues that Mr. White was trying to work through when he was attacked by BHPSD officers have now worsened significantly due to the violent tackle and its derivative effects.  Mr. White maintains that there is nothing that he can do to change his disability or race, and that those were the only reasons that he was targeted and attacked by the Defendants.  Because these characteristics will not change, the Plaintiff is now terrified of leaving his home and traveling through his community.  For several years prior to the 2021 incident, the Plaintiff walked the streets of Benton Harbor, St. Joseph, Stevensville, Michigan, without once being targeted and attacked by police as a consequence.  Mr. White reports that he was resting under a tree during one such in the spring or summer of 2021,

when a BHPS officer, an African American female, stopped to check on his well-being, listened as he explained his condition, and then offered to give him a ride if he liked.  The Plaintiff asserts that the same behavior of walking and resting in his community was the only behavior that he was engaged in when officers drew their weapons and instigated a violent encounter in November of 2021.

(22)

## SPECIFIC ALLEGATIONS AGAINST ALL DEFENDANTS

The Plaintiff realleges paragraphs 1- 21.

(23)

The City of Benton Harbor, by failing to establish and execute a process for reviewing and resolving citizens complaints against its public safety officers, the City created a work environment lacking accountability for violations of citizens rights and acquiesced to abuse of citizens by regularly ignoring complaints and refusing to reprimand officers who run afoul.  The City's failure to establish any accountability measures for its officers created a work environment of recklessness that contributed to the Plaintiffs injuries.  The City's lack of accountability and reprimand is compounded by BHPS officers being inadequately trained in regards to the rights of citizens.

(24)

The County of Berrien, through its jail, denied the Plaintiff adequate accommodations for his disabilities, proper medication, and caused an elevator door to be closed on his injured shoulder, creating another injury.  The County of Berrien has further established and maintained  customs of racial bias in policing, regular malicious prosecutions, and civil conspiracies carried out in its courtrooms by its judges, public defenders, and county prosecutors against their minority constituents.

(25)

Officer Steve Bobo was one of several officers who assaulted and arrested Mr. White without a valid reason or probable cause of him committing a crime.  Steve Bobo collaborated with his co-defendants in a conspiracy to have Mr. White convicted for unsubstantiated crimes that he did not commit by assisting his co-conspirators with the creation of a false narrative and articulating those false allegations to a jury with the intention of seeing the Plaintiff convicted for crimes he is aware that Mr. White did not commit.  Steve Bobo also attended the Plaintiffs criminal trial to show support to his co-defendants.

(26)

Officer David Wilson is one of several officers who followed the Plaintiff around with weapons drawn, seeking to detain him without cause, and who assaulted and

arrested him by violently slamming him on the concrete.  David Wilson gave false testimony in Mr. White's criminal trial when confirmed that he was the first officer to make contact with Mr. White, while being aware that his co-conspirator officer Shepherd was the first BHPS officer to initiate contact with the Plaintiff.  David Wilson collaborated with others to create a false narrative to cover-up their lack of probable cause and reasoning for assaulting and arresting Mr. White.  David Wilson acted out a conspiracy to have Mr. White convicted of bogus criminal charges when he assisted with creating and articulating a false narrative before a jury with the intention of having Mr. White convicted of crimes that he did not commit.

(27)

Robert Shepherd harassed and terrorized the Plaintiff by drawing and pointing his taser at him for no reason and following him around without explaining what his interest or concern was.  Officer Shepherd escalated the unwanted encounter with the Plaintiff by calling other officers to the scene under false pretenses despite being aware that the Plaintiff had not committed a crime.  Robert Shephard collaborated with others in a conspiracy to have the Plaintiff convicted of crimes he did not commit when he assisted with the creation and articulation of a false narrative of his interaction and wrongful treatment of the Plaintiff.

(28)

Public Defender Jennifer Fields collaborated in the wrongful conviction of her former client, the Plaintiff Johoine White, when she knowingly elicited false testimony from Officer David Wilson with the intention of corroborating the prosecution's false narrative and getting Mr. White convicted of crimes he did not commit.   Jennifer Fields refused to utilize body footage that corroborated the Plaintiff's version of events and denied him an actual defense of the false charges that were levied against him.

(29)

**COUNT I.  FOURTH AMENDMENT VIOLATION – UNREASONABLE SEIZURE: Lack of Reasonable Suspicion and Probable Cause Defendants – City of Benton Harbor, Officers Shephard, Wilson, Bobo, & Unknown Officer 4**

 Plaintiffs, realleges paragraphs 1-28.

(30)

The Defendants violated the Fourth Amendment when they drew weapons and seized the Plaintiff without reasonable suspicion or probable cause of a crime being committed, then slammed his head into the concrete, and falsely accused him of assaulting officers and resisting a valid arrest.

(31)

"Under core Fourth Amendment principles, the government's seizure of a person must be "reasonable," U.S. Const. amend. IV, and a seizure that rises to the level of an arrest must be supported by probable cause." *See Kaupp v. Texas,*538 U.S. 626, 630, 123 S.Ct. 1843, 1846, 155 L.Ed.2d 814 (2003) ; *Michigan v. DeFillippo,*443 U.S. 31, 36–37, 99 S.Ct. 2627, 2631–32, 61 L.Ed.2d 343 (1979). *Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 628 (E.D. Mich. 2016).  "The Supreme Court "repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo,*443 U.S. at 37, 99 S.Ct. at 2632. Moreover, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." 443 U.S. at 36, 99 S.Ct. at 2631. *Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 628 (E.D. Mich. 2016).  The Plaintiff was simply walking and resting on the sidewalk. When officers saw him, the Plaintiff had violated any state law before he was violently detained without reason by the Defendants.

(32)

"First, the right to be free from seizure and prosecution based on fabricated evidence was clearly established at the time of Plaintiff's arrest and prosecution. *See Spurlock v. Satterfield,* 167 F.3d 995, 1006-07 (6th Cir. 1999) ("[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures . . . . Similarly, a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would also be unlawful.")" *King v. Harwood*, 852 F.3d 568, 582-83 (6th Cir. 2017)." *Tanner v. Walters*, 1:19-cv-849, at *19 (W.D. Mich. Oct. 14, 2022).  "When an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. *Id*., at 498. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida* v. *Bostick*, 501 U.S. 429, 437 (1991). *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  The Plaintiff was only walking and resting in his community when officer Shephard drew his taser and sought to detain him without cause.  The Defendant used the Plaintiff's reaction to his taser being pointed at him as a pretext to fabricate suspicion and accuse the Plaintiff of crimes he did not commit.  At no point prior to having weapons drawn

on him, did Mr. White commit a crime or do anything suspicious indicating that a crime was afoot.

(33)

"A reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock*, 167 F.3d at 1006." *Smith v. Cnty. of Wayne*, No. 21-12070, at *33 (E.D. Mich. Dec. 19, 2023). By accusing the Plaintiffs of failing to stop at a stop-sign, the Defendants fabricated probable cause and used it to seize, arrest, and prosecute the Plaintiffs. "The Fourth Amendment, after all, prohibits *all* unreasonable seizures—regardless of whether a prosecution is ever brought or how a prosecution ends. A "Fourth Amendment wrong" "is fully accomplished," *United States v. Calandra,*414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), when an impermissible seizure occurs. The Amendment is violated and the injury is inflicted no matter what happens in any later proceedings." *Manuel v. City of Joliet*, 137 S. Ct. 911, 925-26 (2017).   The Plaintiffs wrongful conviction was born from the Defendants fabrication of probable cause, initiation of false charges, and their unconstitutional prosecution for crimes Mr. White did not commit.

(34)

## COUNT II.  FOURTH AMENDMENT VIOLATION – UNREASONABLE

## SEIZURE: Excessive Force

## Defendants – Officers Shepherd, Wilson, Bobo, & Unknown Officer 4

Plaintiffs, realleges paragraphs 1-33.

(35)

The Defendants violated the Fourth Amendment when they seized the Plaintiff with excessive aggression, hostility, and physical force, while slamming him to the cement, causing his head and back to smash on the ground.

(36)

In this circuit, "the reasonableness inquiry in a Fourth Amendment excessive force case is objective. In *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court explained the relevant question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, *without regard to the underlying intent or motivation. . . .* An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good

intentions make an objectively unreasonable use of force constitutional. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004).

(37)

"Whether an officer's use of force was reasonable turns on the facts of each case. Relevant to the inquiry are (1) the severity of the crime at issue, (2) the immediate threat the suspect poses to the safety of the officer or others, (3) the suspect's resistance, if any, and (4) the possibility of flight. *Id.* at 396, 109 S.Ct. 1865. The objective reasonableness inquiry is well-established: The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . *Not every push or shove,* even if it may later seem unnecessary in the peace of a judge's chamber, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004).  In the facts before this Court, there was no crime at issue and the Defendants knew that they did not have a reasonable suspicion or probable cause of a crime.  The Plaintiff did not pose a threat to

anyone by taking a walk and resting on his home street and in his neighborhood. The Plaintiffs resistance to the Officers attempts to speak with him were solely based on their inability to articulate any reasoning for the proposed conversation. The Defendants escalated an encounter they had no right to initiate, thereby causing injuries and trauma to the Plaintiff.

(38)

The Plaintiffs did not present a threat to the officers nor was there any significant crime afoot to reconcile the forceful seizure and deployment of a police dog.  Just as not every push and shove violates the 4th amendment, not every resistance of an Officer's command is illegal, of the same quality, nor necessitates the use of a police dog.  The Defendants violated the Fourth Amendment when they seized the Plaintiffs with excessive aggression, hostility, and physical restraint, before deploying a police dog and unnecessarily causing the K-9 to bite the Plaintiff and unreasonably exposing them to danger causing trauma,

(39)

**COUNT III. RACIAL PROFILING – Equal Protection Violation**

**Defendants – City of Benton Harbor, Officers Shepherd, Wilson, Bobo, &**

**Unknown Officer 4**

(40)

Plaintiffs, realleges paragraphs 1-41.  The Defendants committed racial profiling when they followed the Plaintiffs after noticing their race and seized them without a reasonable suspicion, probable cause, or seeing a crime being committed.

(41)

"Particular attention should be paid to racial profiling claims where, as here under the majority's view, the police's discretion is unconstrained by a heightened suspicion requirement to target a driver" *U. S. v. Ellison*, 462 F.3d 557, 573 (6th Cir. 2006).

(42)

The Sixth Circuit has clarified that "we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons," and thus, after a prima facie case of discrimination has been made, "when all legitimate reasons for [a given action] have been eliminated as possible reasons for the [action], it is more likely than not the [decisionmaker], who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race" *U. S. v. Ellison*, 462 F.3d 557, 574 (6th Cir. 2006).  The Plaintiff asserts that the Defendants were determined to pursue him after seeing his

race and disability, and that he was violently seized without probable cause of a crime being committed or afoot.  The Plaintiff maintains that he did not do anything suspicious by taking a walk, getting winded, and taking a break on the sidewalk, before having a taser pointed at him and being violently arrested.

(43)

The Defendants committed racial profiling when they followed the Plaintiffs after noticing their race and seized them without a reasonable suspicion, probable cause, or seeing a crime being committed.

(44)

**COUNT IV. SELECTIVE ENFORCEMENT – Equal Protection Violation**

**Defendants: City of Benton Harbor, Officers Shepherd, Wilson, Bobo, &**

**Unknown Officer 4**

(45)

Plaintiffs, realleges paragraphs 1-43.  The Defendants violated the equal protection clause of the Constitution when they seized, forcibly arrested, and initiated prosecutions against the Plaintiff while aware that he did not commit a crime.

(46)

"The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."" *Hill v. City of Southfield*, No. 09-cv-12373, at *6-7 (E.D. Mich. Nov. 22, 2010).  Furthermore, "selective enforcement can lead to section 1983 liability if the plaintiff can show purposeful discrimination. The presence of probable cause does not bar an equal protection claim." *Hill v. City of Southfield*, No. 09-cv-12373, at *6 (E.D. Mich. Nov. 22, 2010).

(47)

"To establish a claim of selective enforcement based on race, the plaintiff must show 1) a government official singled the plaintiff out as belonging to a certain race for arrest even though the same government official decided not to arrest other similarly-situated persons not belonging to the plaintiff's race; 2) the official initiated the arrest with a discriminatory purpose in mind; and 3) the arrest had a discriminatory effect upon the racial group to which the plaintiff belongs." *Hill v. City of Southfield*, No. 09-cv-12373, at *7 (E.D. Mich. Nov. 22, 2010).  "To satisfy the first and third elements of a selective enforcement claim, a plaintiff must make a prima facie showing that similarly-situated persons outside his race were not arrested. *Gardenhire*, 205 F.3d at 319. He can do so by naming a similarly situated

individual who was not investigated, or through the use of statistical or other evidence. *Farm Labor Organizing Comm. v. Ohio State Highway*, 308 F.3d 523, 534 (6th Cir. 2002). There is a strong presumption that officers have properly discharged their duties, and a plaintiff must come forward with clear evidence to the contrary in order to rebut this presumption. *Gardenhire*, 205 F.3d at 319. The standard is demanding. *Id." Hill v. City of Southfield*, No. 09-cv-12373, at *7 (E.D. Mich. Nov. 22, 2010).  The Plaintiff asserts that Black American residents in Berrien County are disproportionately targeted, pursued, and convicted due to the racial biases of officers and established customs of racial animus.

(48)

## COUNT V. CONSPIRACY TO VIOLATE CIVIL RIGHTS – U.S. Const. Amend. VI., Sec. 1983, Sec. 1985(3), Sec. 1981(c), Sec. 1986

## Defendants – Jennifer Fields, Officers Shepherd, Wilson, Bobo, & Unknown Officer 4

(49)

Plaintiffs reallege paragraphs 1-47.  The Defendants acted out a conspiracy to violate civil rights of the Plaintiff when they agreed to initiate false charges and collaborated to prosecute them against Mr. White.

(50)

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, *and to have the Assistance of Counsel for his defense*." U.S. Const. amend. VI.  "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).  "If two or more

persons in any State or Territory conspire…"for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws…if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985 (3).

(51)

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act." 42 U.S.C. § 1986.

(52)

"A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Moore v. City of Paducah,* 890 F.2d 831, 834 (6th Cir. 1989); *Hooks v. Hooks,* 771 F.2d 935, 943-944 (6th Cir. 1985). In order to state a claim of civil conspiracy under § 1983, a plaintiff must show that there was a single plan, that the coconspirators shared in the objective of the conspiracy, violating the plaintiff's constitutional rights, and that an overt act was committed in furtherance of the conspiracy. *Moore,* 890 F.2d at 834; *Hooks,* 771 F.2d at 943-944. *Matthews v. McQuiggin,* No. 2:10-cv-145, at *13 (W.D. Mich. Aug. 29, 2011).   The Defendants shared the single plan and objective of justifying their seizure of the Plaintiffs.   They took overt acts in furtherance of covering up their fourth amendment violation by fabricating incident reports by stating that they saw the Plaintiffs roll through a stop sign and they knew that was false and the Plaintiffs did not commit any traffic violations in front of them.

(53)

"The elements of a conspiracy claim under 42 U.S.C. § 1985(3) do not merely require that an agreement be made for the purpose of depriving someone's constitutional rights. Rather, the conspiracy must exist for the purpose of depriving a person or class of persons of equal protection of the law. *See Radvansky v. City of*

*Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005).” *Hanas v. Inner City Christian Outreach, Inc.*, 542 F. Supp. 2d 683, 695 (E.D. Mich. 2008).  The Defendants acted out their conspiracy to deprive the Plaintiff of his right to travel through his community unmolested.   The Defendants executed their plan to convict the Plaintiff of crimes he did not commit by proffering and articulating a false narrative and perjured testimony before a jury, thereby denying him his Sixth Amendment right to proper representation and his constitutional right to an impartial trial.

(54)

**COUNT VI. VIOLATION OF RIGHT TO TRAVEL – Due Process Violation**

**Defendants – Berrien County, Officers Shepherd, Wilson, Bobo & Unknown Officer 4**

(55)

Plaintiffs reallege paragraphs 1 - 53.  The Defendants subjected the Plaintiff to unreasonable restraints on his ability to travel through the city when, without cause, they seized, forcibly arrested, violently assaulted, and then initiated prosecutions of false charges based on a fabricated version of the incident.  The

Defendants' violent seizure, coupled with their successful conspiracy to convict Mr. White of crimes he did not commit, the Defendants have restricted the Plaintiff from traveling through the community without unreasonable fear.

(56)

"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2.  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

(57)

"The right to travel interstate is a basic, fundamental right under the Constitution, its origins premised upon a variety of constitutional provisions." *Bergman v. United States*, 565 F. Supp. 1353, 1397 (W.D. Mich. 1983).  "The right to travel is a fundamental constitutional right: [F]reedom to travel throughout the United

States has long been recognized as a basic right under the Constitution. . . . The right to travel is an "unconditional personal right," a right whose exercise may not be conditioned." *Grace v. City of Detroit*, 760 F. Supp. 646, 649 (E.D. Mich. 1991). ""The right to move freely about one's own neighborhood or town" is a fundamental liberty interest protected by the Due Process Clause" *Johnson v. City of Cincinnati*, 310 F.3d 484, 496 (6th Cir. 2002).

(58)

"As early as the Articles of Confederation, state citizens "possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom." *United States v. Wheeler,* 254 U.S. 281, 293, 41 S.Ct. 133, 65 L.E. 270 (1920). As Chief Justice Taney observed: For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and as members of the same community, must have the right to pass and repass through every part of it without interruption, *as freely as in our own States." Johnson v. City of Cincinnati*, 310 F.3d 484, 497 (6th Cir. 2002). "Or as the Supreme Court noted at the turn of the twentieth century: "[T]he right to

remove from one place to another according to inclination, is an attribute of . . .
liberty . . . secured by the Fourteenth Amendment and by other provisions of the
Constitution." *Williams v. Fears,* 179 U.S. 270, 274, 21 S.Ct. 128, 45 L.Ed. 186
(1900). More recently, Justice Stevens, joined by Justice Souter and Justice
Ginsburg, observed: [I]t is apparent that an individual's decision to remain in a
public place of his choice is as much a part of his liberty as the freedom of
movement inside frontiers that is "a part of our heritage" *Kent v. Dulles,* 357 U.S.
116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), or the right to move "to
whatsoever place one's own inclination may direct" identified in Blackstone's
Commentaries. 1 W. Blackstone, Commentaries on the Laws of England 130
(1765). *Johnson v. City of Cincinnati*, 310 F.3d 484, 497 (6th Cir. 2002).

(59)

"Clearly, the deprivation of the right to equal protection and to travel freely
interstate falls within the category of injuries contemplated by § 1986. *See,
Bergman v. United States, supra,*565 F. Supp. at 1394-95. In fact, in discussing the
nature of the negligence cause of action in that opinion, this Court specifically
found that "the government's negligence lies in its failure to intercede to protect
Plaintiffs' right to interstate travel and to equal protection of the law." *Id.* at 1411. It

would be incongruous to now ignore those injuries in assessing damages." *Bergman v. United States*, 579 F. Supp. 911, 934-35 (W.D. Mich. 1984).

(60)

The Defendants subjected the Plaintiff to their customs of seizing minority travelers without probable cause and racial animus, when they created and escalated the encounter by drawing their weapons, pointing them at the Plaintiff, seizing the Plaintiffs without cause

(61)

**COUNT VII.  INTENTIONAL DISCRIMINATION: VIOLATIONS OF TITLES II & VI OF THE 1964 CIVIL RIGHTS ACT "*§ 601 of Title VI, 42 U.S.C. § 2000d, Sec. § 1983*"**

**Defendants – County of Berrien, Jennifer Fields, City of Benton Harbor, Officers Shepherd, Wilson, Bobo, and Unknown Officer 4**

(62)

Plaintiffs, realleges paragraphs 1-60.  The County of Berrien Defendant violated the Plaintiff's rights to access to federally-funded medical services when they intentionally denied Johoine White requests for his proper medication dosage,

refused to provide accommodations for his mobility issues, and denied him medical attention for the injury caused by their lack of accommodations because of his race.   The Police officer defendants denied the Plaintiff law enforcement services when they ignored his earlier complaints about being attacked by neighbors, but then days later, singled out the Plaintiff, pulled their weapons on him, and instigated false charges against him because he is a disabled Black American.

(63)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

(64)

"Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits race discrimination in "any program or activity receiving Federal financial assistance." It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." § 2000d. Title VI, unlike Title VII, "prohibits only intentional discrimination." *Alexander v. Sandoval,* 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). *Hotchkiss v. Garno*, 883 F. Supp. 2d 719, 737 (E.D. Mich. 2012).

(65)

The Plaintiff has been intentionally discriminated against because he is a Black American with mobility issues while within Berrien County, where a custom of racial animus abuses has been established.

(66)

**COUNT VII. AMERICAN DISABILITY ACT – Discrimination**

**Defendants – County of Berrien, Jennifer Fields, City of Benton Harbor, Officers Shepherd, Wilson, Bobo, and Unknown Officer 4**

(67)

Plaintiff realleges paragraphs 1- 66.  The Defendants discriminated against the Plaintiff when they refused him the regular, common treatment of a normal inmate, denied him accommodations for his disabilities, and refrained from performing the

normal execution of services to Mr. White because he is a disabled Black American.

(68)

"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in 1 Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State." 42 U.S.C. § 12202.

(69)

"An ADA plaintiff must satisfy two requirements to establish a prima facie case of discrimination: (1) that the plaintiff has an impairment; and (2) that the impairment

interferes with a major life activity." *Kvintus v. R.L. Polk Co.*, 3 F. Supp. 2d 788, 794 (E.D. Mich. 1998).  "In order to make out a *prima facie* case under title III of the ADA the plaintiff must prove (1) that she has a disability; (2) that defendant's office is a place of public accommodation; and (3) that she was discriminated against by being refused full and equal enjoyment of medical treatment because of her disability. *Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1164 (E.D. Mich. 1994).

(70)

Plaintiff Mr. Johoine White suffers from physical health disabilities and limitations that were known to the Defendants when they took him into their custody.  Mr. White voiced his disabilities several times before being taken to the hospital, where his medical records were retrieved and his disability status was confirmed to the Defendants.  Mr. White continued to make Berrien County staff aware of his disabilities while being confined in the Berrien County jail.  Despite those pronouncements of his disabilities, the Plaintiff was denied his proper medication and accommodations transporting his belongings through the jail.  The Defendants had wheelchairs and carts available as accommodations for the Plaintiff but refused to utilize either in his movements through jail, directly causing more injuries to the Plaintiff.

(71)

The Defendants violated the American Disabilities Act when they denied the Plaintiff his medications, refused to provide accommodations for his mobility disabilities when transporting his tote bag through jail, and denied him medical attention for the injury that occurred as a result of their denial of accommodations.

(72)

## COUNT VIII. REHABILITATION ACT of 1973 – Discrimination

## Defendants – County of Berrien, Jennifer Fields Officers Shepherd, Wilson, Bobo, and Unknown Officer 4

(73)

The Defendants violated the Rehabilitation Act of 1973 when they denied the Plaintiff the benefits of a federally funded program and discriminated against him because of his disabilities when they instigated an excessively violent encounter and arrest.   The County of Berrien further denied Plaintiff medications and mobility accommodations within the Berrien County Jail, directly causing further injuries.   After observing the Plaintiffs mobility disabilities and presumming him mentally disabled, the police Defendants initiated an excessively violent arrest

when they attempted to tase him and then slammed him to the ground without attempting a regular arrest.

(74)

"No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

(75)

The elements of a cause of action under section 504 are as follows: (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance. *Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988).  The Plaintiff is a handicapped person under the act because he has a serious impediment normal activities, is otherwise qualified for participation in the Berrien County criminal justice system,

has been denied benefits and subjected to discrimination under the program solely by reason of his handicap, and the Benton Harbor Public Safety Department, Berrien County Jail, and Berrien County Courthouse conduct their activities through the use of Federal financial assistance.

(76)

The Defendants violated the Rehabilitation Act of 1973 when they denied the Plaintiff the benefits of a federally funded program and discriminated against him because of his disabilities when they instigated an excessively violent encounter and arrest.  While aware of the Plaintiffs disabilities, the County of Berrien denied Plaintiff medications and mobility accommodations within the Berrien County Jail as an arbitrary punishment, using his disabilities as a weapon against him, directly causing further injuries.  After observing the Plaintiffs mobility disabilities and presumming him mentally disabled, the police Defendants initiated an excessively violent arrest when they attempted to tase him and then slammed him to the ground without attempting a regular arrest.  Because the Plaintiff is disabled, the Defendants initiated false charges against him and conspired to have him convicted on the basis of their false allegations.

(77)

## DAMAGES

Plaintiffs, realleges paragraphs 1-.76

(78)

A "jury may be permitted to assess punitive damages in an action under § 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally-protected rights of others and such threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness. 42 U.S.C.A. § 1983. Smith v. Wade, 461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).   The calculation of future damages for types of future damages described in subsection (1)(b) shall be based on the costs and losses during the period of time the plaintiff will sustain those costs and losses. M.C.L. § 600.6305.

(79)

## RELIEF REQUESTED

Plaintiff, realleges paragraphs 1-78

(80)

As a result of the aforementioned legal violations suffered by the Plaintiff and caused by the Defendants, this Plaintiff is enduring chronic pain, loss of enjoyment

of life, and post traumatic stress symptoms manifested in mental anguish, humiliation, outrage, and emotional turmoil.

(81)

**Wherefore**, the Plaintiff respectfully requests that this Honorable Court enter a Judgment in her favor against Defendants for the following relief:

I.    That $3,000,000.00 be paid in compensatory and exemplary damages to the Plaintiff to compensate him for the mental and physical anguish, loss of enjoyment, and the post traumatic stress he will continue to endure;

II.   That $500,000.00 be paid as an award of interest, costs, and reasonable attorney fees;

III.  Any other compensatory, exemplary, or equitable relief that this Honorable Court deems appropriate at the commencement of trial.

**THE J.R. BEASON FIRM, PLLC.**
Attorney John R. Beason III
For the Plaintiffs

Dated: October 20th, 2024                By: /s/ John R. Beason III, Esq.
The J.R. Beason Firm PLLC.
D.C. Bar No.: 1721583
IBA Bar No.: 1522438
853 McAlister Ave.
Benton Harbor, MI 49022
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

JOHOINE WHITE, Individually


     Plaintiff.                                         Case No.:


v.                                                              Hon. Judge Hala Y. Jarbou

CITY OF BENTON HARBOR;
COUNTY OF BERRIEN;
OFFICER STEVE BOBO, Individually
and in his official capacity; OFFICER
DAVID WILSON, Individually
and in his official capacity; OFFICER
ROBERT SHEPHARD, Individually
and in his official capacity; JENNIFER
FIELDS, Individually and in her official
capacity; Any other yet be discovered
parties.

     Defendants.

---

## **<u>JURY DEMAND</u>**

    To the extent that a jury trial is allowed with regard to any of the issues as set forth above, Plaintiff mercifully demands such.

                      **THE J.R. BEASON FIRM, PLLC.**
                        Attorney John R. Beason III
                        For the Plaintiff

Dated: October 20th, 2024

By: /s/ John R. Beason III, Esq.
Attorney John R. Beason III
D.C. Bar No.: 1721583
IBA Bar No.: 1522438
853 McAlister Ave.
Benton Harbor, MI 49022
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com